IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JERRI WITT, and CRAIG WITT | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | Case No. 09 CV 3036 |
| TBI MORTGAGE, a foreign corporation, | ) ) ) | MAGISTRATE JUDGE ARLANDER KEYS |
| Defendant. | ) | |

**Memorandum Opinion and Order**

Plaintiffs Jerri Witt and Craig Witt (collectively "Plaintiffs" or "the Witts") filed suit against Defendant Toll Brothers Investment Mortgage Company (hereinafter "TBI" or "Defendant") alleging fraud in their attempt to secure a mortgage loan for a custom-built home. Specifically, in the First Amended Complaint [17], Plaintiffs seek damages alleging fraud, promissory estoppel, and violations of the Consumer Fraud Act. Defendant moves for summary judgment as to all claims against it. For the reasons set forth below, Defendant's motion for summary judgment [66] is denied.

I.   **Background Facts**

Plaintiff Jerri Witt was licensed as a realtor in 2004 and is affiliated with Baird and Warner. (Pls.' Resp. to R. 56.1 Statement ¶ 6.) Plaintiff Craig Witt has earned an accounting degree and has taken postgraduate courses in finance. (*Id.* at ¶ 6.) Plaintiffs state that none of Mr. Witt's courses in accounting or finance were related to real estate financing,

mortgages, or similar subject matter. (*Id.*) Mr. Witt is a Vice President of Sales for a technology company and operates the sales branch of software in the Midwest and Canada. (*Id.* at ¶ 8.) As of 2007, the Witts had purchased five homes, three of which were built to their specifications, and all of which were financed through mortgages. (*Id.* at ¶ 9.)

On February 18, 2007, Plaintiffs entered into an "Agreement of Sale" ("Sales Agreement") to purchase a custom home (the "Home") from Toll IL HWCC (the "Builder" or "Toll Bros."). (Def.'s R. 56.1 Statement ¶ 10.) The Builder is an affiliate of Toll Brothers, Inc. (*Id.*) Defendant TBI is a "correspondent lender" and has the same parent company as the Builder. (*Id.* at ¶ 3.) Defendant TBI processes, underwrites, and closes the mortgage loans it issues with the intent of selling them to investors who service the loans. (*Id.* at ¶ 4.)

Plaintiffs initially contracted to purchase the Home for $822,975, and at the time Plaintiffs signed the Sales Agreement, the amount due at closing was expected to be $792,975, because Plaintiffs' $5,000 deposit to reserve the lot on which the Home would be built and their $25,000 deposit at the time of signing were credited towards the purchase price. (Def.'s R. 56.1 Statement ¶ 11.) The Sales Agreement required Plaintiffs to obtain a loan approval by Defendant TBI, in order to qualify for the purchase. (*Id.* at ¶ 12). It is disputed whether the Sales Agreement also required Plaintiffs to submit a mortgage

application to "any other lender of [Plaintiffs'] choosing."

(*Id.*)  The Sales Agreement further provides that, if the Buyer is

not approved for a mortgage within 60 days of the execution of

the Agreement of Sale, the Seller may extend the mortgage

application approval process until either:

> (1) Seller submits another application on substantially the
> same terms described above to a lender chosen by Seller,
> with no additional application fee to Buyer, or (2) Seller
> declares this Agreement null and void in which event of all
> sums paid on account of the purchase price and extras shall
> be returned to Buyer without interest, and neither party
> shall have any further rights or liabilities hereunder.

(Pls.' Add'l R. 56.1 Statement ¶ 26.)

Shaun Cristol is a loan officer for TBI.  His position

entails communicating with loan applicants to collect information

needed to evaluate their applications and compiling a physical

loan file, which he submits to an underwriter for review.

(Def.'s R. 56.1 Statement ¶ 15.)  According to Mrs. Witt, she and

Mr. Cristol discussed, via telephone, the information required to

complete a Uniform Residential Loan Application, and Mrs. Witt

contends she sent Mr. Cristol information relating to Plaintiffs'

finances after their alleged telephone conversation on March 5,

2007.  (*Id.* at  ¶¶ 13, 15.)  In his deposition, when questioned

regarding how long the loan process takes, Mr. Cristol stated

that, "Depending on the turnaround times, it could take a couple

weeks to perhaps a month, over a month, assuming there's enough

information in the file to render a decision."  (Cristol Dep. 7:

20-23).

After Mrs. Witt spoke with Mr. Cristol, Plaintiffs received several documents from TBI, including a Uniform Residential Loan Application ("Application"), the Good Faith Estimate ("GFE"), Itemization, Acknowledgment, and Disclosure Booklet in a Federal Express package ("FedEx Package"). (Def.'s R. 56.1 Statement ¶ 37.) The Application that Plaintiffs received had been filled in with the personal and financial information Plaintiffs provided to TBI. (*Id.* at ¶ 16.) Plaintiffs signed the Application on April 23, 2007 and returned it to Mr. Cristol. (*Id.* at ¶ 17.)

According to Mrs. Witt, when she called Mr. Cristol after receiving the Application he prepared to remind him that she wanted an interest only loan, Mr. Cristol told Mrs. Witt "it doesn't matter at this point." (Pls.' Add'l R. 56.1 Statement ¶ 6.) Mr. Cristol added "there [are] many loan programs available to you, when we get closer to closing, we will identify that ... you might want to go with a 3 and 1 ARM, you might want to do an interest only, you might want to do something based on where the rates are." (J. Witt Dep. 108:13-22.) When asked what did Mr. Cristol "say about the availability of mortgage loans, if anything, at that point?" Mrs. Witt responded, "every kind of loan was available," "the sky was the limit," "interest only, jumbos, arms, 80/20, it didn't matter." (*Id.* at 108:23-109:9.)

Plaintiffs elected in the Acknowledgment to "float" rather than lock-in, meaning they agreed that the loan program, interest rate, and points applicable to the loan they requested would

4

"fluctuate until settlement or until [they] choose to Lock-in."
(Def.'s R. 56.1 Statement ¶ 25.) The GFE added the Estimated
Closing Costs and Estimated Prepaid Items to the Home's estimated
purchase price ($1,600,000), taking that total to $1,608,359.60,
and subtracted it from the loan amount in the Application
($1,280,000) to estimate how much money Plaintiffs would need to
bring to the closing to purchase the Home ($328,359.60). (*Id.* at
¶¶ 28, 36.)

Mrs. Witt contends that the documents in the FedEx Package
formed a promise by TBI to provide Plaintiffs with a loan on the
terms reflected in the Application; i.e., a loan in the amount of
$1,280,000, payable over 30 years with a fixed rate of interest
of 6.875% and an 80/20 loan-to-value ratio. (Def.'s R. 56.1
Statement ¶ 38.) When the Plaintiffs first began working with
Shaun Cristol in or about March 2007, he did not believe "the
customer had qualified for the program they were requesting."
(Pls.' Add'l R. 56.1 Statement ¶ 7.) He claims that he tried to
"give them tips as to how they may be able to increase their
credit score in order to qualify for the loan they were seeking."
(Cristol Dep. 19:2-7.)

During the construction process, Mrs. Witt "sporadically" or
"occasionally" followed-up with Mr. Cristol to ensure that he had
the most current and accurate information and to make sure she
would know what would be required of her at closing. (Pls.'

Add'l R. 56.1 Statement ¶ 19.)  According to Mrs. Witt, Plaintiffs were justified in concluding that TBI approved Plaintiffs' request for a mortgage loan because Ms. Wieseneth, the Builder's sales manager, allegedly told Plaintiffs that the Builder "got all of [Plaintiffs'] mortgage stuff" and that "all we're waiting for now is permits." (Def.'s R. 56.1 Statement ¶ 40.)  It is disputed which affiliate Cathy Wieseneth worked for.

Karin Cornell was an underwriter for TBI Mortgage.  (Pls.' Add'l R. 56.1 Statement ¶ 3.)  The final determination or approval of a loan lies with the underwriter, who in Plaintiffs' case was Ms. Cornell.  (*Id.* at ¶ 10.)  Plaintiffs' loan material was sent to an underwriting manager on or about May 16, 2007.  (*Id.*)  A mortgage is typically approved before or at the time construction of the home begins.  (*Id.*)

It is the stated mission of TBI to provide customers of Toll Bros. access to a loan and this mission is represented to customers when they begin working with TBI.  (Pls.' Add'l R. 56.1 Statement ¶ 5.)  Further, Plaintiffs state that Mr. Cristol and Ms. Wieseneth represented to Mrs. Witt that TBI and Toll Bros. operate "a seamless process" and every document created with the Builder, Toll Bros., is sent to TBI.  (*Id.*)  Defendant disputes this statement and Mr. Cristol and Anders Gode, the Toll Bros. project manager for the Home, have testified that this type of communication between the affiliates did not take place in this

case. (Def.'s Resp. to Pls.' Add'l R. 56.1 Statement ¶ 5.)

Toll Bros. began construction on the Home in June 2007. (Pls.' Add'l R. 56.1 Statement ¶ 19.) Mr. Gode oversaw the home building operations, including sales, construction, and development. (*Id.*) Mr. Gode does not recall having talked to Mr. Cristol before construction began. (*Id.* at ¶ 17.)

Plaintiffs added multiple upgrades to the Home their Builder agreed to build for them, the exact amount of upgrades is disputed. (Def's. R. 56.1 Statement ¶ 44.) Each upgrade modified the Home described in the Sales Agreement, and Plaintiffs and the Builder memorialized the modifications in written agreements that were reflected on a form "Exhibit B" to the Sales Agreement and were numbered 1-7, 50, and 51. (*Id.* at ¶ 46.) Under the terms of Plaintiffs' Ex. Bs, Plaintiffs agreed to pay a "[d]own payment at signing of [the] Ex. B[s]" to the Builder, and each down payment amounted to 20% of the cost of the corresponding upgrade. (*Id.* at ¶ 47.) All total, Plaintiffs purchased approximately $1,086,335 in upgrades and paid the Builder $247,211 in down payments. (*Id. at* ¶ 54; Pls'. Resp. to R. 56.1 Statement ¶ 54.) The addition of Plaintiffs' upgrades raised the Home's purchase price from $822,975 to $1,867,100. (*Id. at* ¶ 55.)

According to Mrs. Witt, in November of 2007, the Builder asked Plaintiffs to seek loans from other lenders. (Def.'s R. 56.1 Statement ¶ 58.) After Mrs. Witt was informed of the

potential that she would not receive a TBI mortgage, she called
Mr. Cristol and on November 14, 2007, he advised Mrs. Witt that
TBI was unable to offer Plaintiffs a loan. (*Id.* at ¶ 57; Pls.'
Resp. R. 56 at ¶ 57.)  The project manager, Mr. Gode, did not
hear that TBI was not going to issue a mortgage to the Witts from
Mr. Cristol. (Pls' Add'l R. 56.1 Statement ¶ 17.)  He heard that
from Christina Griffin, who works for Defendant TBI, in November
2007.  (*Id.* at ¶¶ 1, 17.)  It was determined that Mr. Gode should
be the one to tell Mrs. Witt that Plaintiffs' loan was denied
because he had a good relationship with her.  (*Id.*)

      Plaintiffs then applied for loans from LaSalle Bank,
Countrywide Home Loans, Guaranteed Rate, and Wachovia Mortgage,
FSB. (Def.'s R. 56.1 Statement ¶ 59.)  In December 2007,
Plaintiffs received an offer to purchase their current house, but
were unwilling to sell their house unless the sale was
conditioned on Plaintiffs' receipt of a mortgage loan that
enabled them to purchase the Home.  (*Id.* at ¶ 61.)  In April
2008, Plaintiffs received a written "Conditional Loan Approval"
from Wachovia, conditioned on Plaintiffs' sale of their current
home. (*Id.* at ¶¶ 62, 63.)  While Plaintiffs had a potential buyer
for their current house, the buyer was unable to purchase the
home when his financing fell through and, consequently,
Plaintiffs were unable to satisfy the Wachovia loan approval's
conditions. (*Id.* at ¶ 64.)

Plaintiffs were unable to close on the purchase of the Home and, in August 2008, the Builder declared Plaintiffs to be in default of their obligations under the Sales Agreement. (*Id.* at ¶ 65.) Between the $217,211 in down payments Plaintiffs paid for their upgrades and the $30,000 in deposits reflected in the Sales Agreement, Plaintiffs contend the Builder was in possession of $247,211 of their money. (*Id.* at ¶ 66.) Following its declaration of Plaintiffs' default, the Builder has retained possession of those payments. (*Id.* at ¶ 67.) After the Builder declared that Plaintiffs were in default, Mrs. Witt read transcripts of quarterly reports to investors by Robert Toll and TBI's Chief Financial Officer, Don Salmon, and found that allegedly all along TBI would not have provided a mortgage for the Witts based upon their credit scores, nor would it have issued a loan with a loan-to-value ratio of 80/20, as the Witts sought. (Resp. at p. 3.) This lawsuit followed.

## II. Standard of Review

Summary judgment is proper if the "pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c)(2); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the

nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Though this standard places the initial burden on the moving party, once it has met this burden of production, the nonmoving party "may not rely merely on allegations or denials in its own pleading," but instead must "set out specific facts showing a genuine issue for trial." Fed. R. Civ. P. 56(e). When deciding whether summary judgment is proper, the Court must accept the nonmoving party's evidence as true and draw all inferences in favor of that party, here the Witts. *See Anderson*, 477 U.S. at 255.

In order to successfully oppose a motion for summary judgment, the nonmoving party must do more than raise a metaphysical doubt as to the material facts. *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586. (1986). Rather, they must come forward with specific facts showing that there is a genuine issue for trial. *Id.* at 587. The nonmoving party must offer more than a mere scintilla of evidence to survive summary judgment, and conclusory allegations are insufficient to defeat a motion for summary judgment. *Keri v. Bd. of Trustees of Purdue Univ.*, 458 F. 3d 620, 628 (7th Cir. 2006).

## III. Discussion

Plaintiffs divide their First Amended Complaint into three counts against Defendant: Fraud (Count I), Consumer Fraud Act

10

(Count II), and Promissory Estoppel (Count III).  Defendant moves for summary judgement on all three counts.

## A.    Count I - Fraud

In Count I, Plaintiffs claim that on or about March 5 through March 20, 2007, Defendant TBI knew that it "could not and would not provide a loan to value mortgage of 80/20% on a 30 year fixed mortgage at a rate less than 7%," but represented to Plaintiffs in March 2007 that it could and would provide such mortgage despite knowing the representation was false.  (Am. Compl. at §26.)  To recover for fraud, Plaintiffs must prove: (1) TBI made a false statement of a material fact; (2) TBI knew that the statement was false; (3) TBI intended that the statement induce Plaintiffs to act; (4) Plaintiffs justifiably relied upon the truth of the purported statement; and (5) Plaintiffs sustained damages resulting from their reliance on the alleged statement.  *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496 (1996).  Defendant argues that it is entitled to judgment on Count I, because Plaintiffs cannot prove certain elements of fraud.

### 1.    A False Statement of a Material Fact

First, Defendant alleges that Plaintiffs cannot prove their contention that TBI represented "it could and would provide," at the closing on the Home, a 30-year fixed mortgage loan in the amount of $1,280,000 at an interest rate of less than 7% and an 80/20 loan-to-value ratio, despite being the terms reflected in

the Application. TBI argues that the undisputed facts show that TBI did not make any such representation.

Specifically, Defendant contends that the Application, Acknowledgment, TILDS, Itemization, and GFE provided to Plaintiffs make clear that there was no commitment to lend but, rather, the documents included only preliminary statements and estimates of the costs Plaintiffs might incur in connection with the loan for which they applied. (Mot. at pp. 10-11.) Defendant points out that the TILDS expressly stated in capital letters prominently displayed at the top of the page that it was "NEITHER A CONTRACT NOR A COMMITMENT TO LEND." (*Id.* at 10.) Also, in the Acknowledgment, which was part of Plaintiffs' Application, Defendant argues that Plaintiffs conceded TBI was not committing to issuing Plaintiffs a loan when they signed the following statement: "I/We understand that this form is not a commitment to lend money." (*Id.*) In addition, Defendant argues that the TILDS and GFE both explained they were merely "estimates," as opposed to representations, promises, or commitments to lend. (*Id.*) Defendant adds that "no 'could and would' representations can be inferred from the fact that TBI issued those documents because federal law required TBI to issue them to Plaintiffs." (*Id.* at p. 11.)

In response, Plaintiffs argue that TBI's promise that it "could and would" provide a loan based on specific terms is "significantly broader than the Defendant's brief would

indicate." (Resp. at p. 9.) Plaintiffs allege that they did not rely solely on the Application materials included in the FedEx Package they received in April 2007, but on the "broad, continual relationship they had with TBI Mortgage throughout the construction and financing process." (*Id.* at p. 10.) Plaintiffs explain that this relationship was premised on representations that Plaintiffs qualified for a loan with TBI Mortgage, including a loan based on the specific terms articulated by Defendant. (*Id.* at pp. 9-10.) To support their position that their perception of receiving the loan was premised on representations made by TBI, Plaintiffs point to the following facts: that they began working with TBI in March 2007, signing the application on April 23, 2007, and were not officially notified in writing that they would not receive a mortgage until 2008; that they relied on the timeline represented by TBI for how long financing would take(the Agreement with Toll Bros. provides that the buyer must be approved for a mortgage within 60 days of sale); TBI's promise that the mortgage application would be promptly processed; the fact that in June 2007, Toll Bros. began construction on the Plaintiffs' Home; Mr. Cristol's silence when Mrs. Witt told him about Plaintiffs' upgrades and progress of construction; and that after construction began, Mrs. Witt remained in contact with Mr. Cristol, evidencing a continual financing process.

When deciding whether summary judgment is proper, the Court must accept the nonmoving party's evidence as true and draw all

inferences in favor of that party. Here, given the continual communication between Mrs. Witt, TBI, and Toll Bros., and the actions of these entities, there is a genuine issue of material fact as to whether TBI's actions created a false representation regarding the availability of the loan.

In its reply brief, Defendant alters its argument regarding the presence of a false statement of material fact and raises the issue of an action for "fraud by omission." In cases of concealment, the traditional fraud analysis is modified, and, in order to prove the concealment amounted to a fraudulent misrepresentation, Plaintiff must prove: (1) the concealment of a material fact, (2) the concealment was intended to induce a false belief, under circumstances creating a duty to speak, (3) the innocent party could not have discovered the truth through a reasonable inquiry or inspection, or was prevented from making a reasonable inquiry or inspection, and relied upon the silence as a representation that the fact did not exist, (4) the concealed information was such that the injured party would have acted differently had it been aware of it, and (5) the reliance by the person from whom the fact was concealed led to his injury. *See Williams v. Chicago Osteopathic Health Sys.*, 654 N.E.2d 613, 622 (1st Dist. 1995). Defendant argues that Plaintiffs cannot prove the "omission" element of their fraud as the undisputed facts demonstrate that Mr. Cristol told Plaintiffs in the spring of 2007 that they needed to increase their credit scores in order to

qualify for the loan they were seeking, thus implying that TBI had not approved their loan Application or that Plaintiffs' loan Application was "progressing smoothly." (Reply at p. 5.) This argument fails. It is disputed whether Mr. Cristol made clear to Mrs. Witt that the loan could not be approved unless the Witts' credit scores improved. In addition, Mr. Cristol's deposition does not remedy the issue of fact discussed above, because the parties continued their relationship past Spring 2007 and other events took place that create a question of fact as to the progress of the loan. Therefore, this issue is to be left to the trier of fact.

In addition, Defendant argues that Plaintiffs cannot prove fraud by omission, because TBI did not have an obligation to speak. TBI bases this argument on its position that it did not have an obligation to send a denial letter in the spring of 2007 because the loan had not yet been denied, but instead "not approved." However, the fact that the loan was not denied in Spring 2007 is disputed. Plaintiffs allege that the underwriters denied their Application in May 2007. Thus, this is also a genuine issue of material fact to be decided at trial.

## 2. Knowledge that the Statement was False

Next, TBI argues that Plaintiffs cannot prove the second element of fraud, because TBI had no way of knowing, at the time it sent the FedEx Package to Plaintiffs, that it "could not" or "would not" issue Plaintiffs the mortgage loan reflected in the

Application. Defendant states that even Mrs. Witt acknowledged that the mortgage loan market fluctuates and the terms on which mortgage loans are available can change on a weekly basis. (Mot. at p. 14). Defendant also argues that, due to the fact that their loans are "underwritten to guidelines set by third-party servicing investors that purchase the loans, it would not know at the time the FedEx Package was sent whether it could or would issue a specific loan at an unspecified future date." (*Id.*)

In response, Plaintiffs argue that Mr. Cristol of TBI knew that Plaintiffs would not qualify for a mortgage with TBI as early as April or May 2007. (Resp. at pp. 13-14.) Plaintiffs cite to Mr. Cristol's statement that "at the time, I don't believe the [Witts] qualified for the program they were requesting. And what we tried to do are give them tips as to how they may be able to increase their credit scores in order to qualify for the loan they were seeking." (Cristol Dep. 19:2-7.) Yet, despite this alleged information known by Mr. Cristol, Plaintiffs argue that TBI failed to notify them that they would not receive a loan, but instead allowed construction to proceed on the Home. Further, Plaintiffs allege that, in May or early June 2007, the underwriter, Ms. Cornell, stated definitively that Plaintiffs did not qualify for a TBI mortgage and that their Application had been denied. (Add'l Rule 56.1 Statement at ¶¶10-11). However, again, Plaintiffs were never informed of this decision despite ongoing interactions with TBI agents.

Defendant, in its reply, argues that there is no evidence that
Ms. Cornell "denied" the loan in Spring 2007, but instead attempt
to decipher the meaning between "denied" and "never approved."
(Reply at 4.)  There is a genuine issue of material fact here,
and thus, Defendant's argument fails.

### 3.    **Justifiable Reliance**

Next, Defendant argues that it is entitled to summary
judgment because, even if it had made a false representation, it
was not a representation on which Plaintiffs could justifiably
rely.  (Mot. at p. 12.)  Again, in making this argument, TBI sets
forth that Plaintiffs could not rely on a GFE or TILDS to
conclude that they had been promised a mortgage loan.  However,
as stated above, Plaintiffs do not claim that they relied on the
Application and other documents sent in the FedEx Package alone
in their allegations against TBI, but on all contacts that they
had with TBI and Toll Bros.  "The right to rely depends on
consideration of all the surrounding circumstances."  *Miller v.
Williams Chevrolet/GEO, Inc.*, 326 Ill.App.3d 642, 651 (1st Dist.
2001).  Given the broad scope of communications and actions (or
lack thereof) between the parties, including the absence of a
denial letter, the allowance of construction to begin, alleged
assurances by TBI employees, and Plaintiffs' lack of knowledge of
TBI's internal guidelines, TBI's request that summary judgment be
granted based on its argument that Plaintiffs could not

justifiably rely on the alleged false statement of material fact is denied.

### 4. Future Actions

Finally, Defendant argues that Plaintiffs' claim of fraud is not actionable in Illinois because any such misrepresentation made by TBI was "regarding future conduct rather than present or past facts." (Mot. at p. 11.)

Plaintiffs respond that, in May or June of 2007, TBI had definitively denied Plaintiffs' Application. (Resp. at pp. 10-11.) "Yet, TBI agents continuously represented to Plaintiffs that the mortgage application process was progressing smoothly and that the loans available were expansive." (*Id.*) TBI's affiliated builder, Toll Bros., even began the construction of Plaintiffs' Home in June 2007, which allegedly it would not have done without Plaintiffs' having obtained financing. The representations that the mortgage application process was progressing smoothly was a misrepresentation of current fact, namely that Plaintiffs' Application was pending, when in reality, a decision had allegedly been reached that Plaintiffs did not qualify. This evidence, when viewed in favor of the non-moving party, creates a genuine issue of material fact regarding whether TBI's representations were made based on current conditions and criteria, making it actionable fraud. This is for a trier of fact to weigh and, therefore, Defendant's argument based on

future action fails.

As to Count I, Defendant's motion for summary judgement is denied.

**B. Count II – Violations of the Consumer Fraud Act**

Plaintiffs also assert a claim for alleged violations of Section 2 of the Illinois Consumer Fraud Act ("ICFA"). That Section provides:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, ... in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS § 505/2 (West 2009). Section 10(a) of the Act authorizes private causes of action for violations of Section 2: "Any person who suffers actual damage as a result of a violation of [the] Act committed by another person may bring an action against such person." 815 ILCS 505/10(a).

Count II requires proof of: (1) a deceptive act or practice by Defendant; (2) Defendant's intent that the Plaintiffs rely on the deception; (3) that the deception occur in the course of conduct involving trade and commerce; and (4) damages to Plaintiffs caused by Defendant. *Miller*, 326 Ill.App.3d at 655. Plaintiffs' ICFA count is based on the same alleged conduct as their fraud count; i.e., that TBI allegedly represented it could

and would provide Plaintiffs a mortgage loan on certain terms. Plaintiffs also assert that TBI's conduct was deceptive because, according to Plaintiffs, TBI never had a loan product for Plaintiffs and it failed to disclose that alleged "fact" to Plaintiffs. TBI argues that their representations are not actionable under the ICFA, because they are statements of future conduct and not deceptive.

### 1. Actionable Under the IFCA

Defendant argues that Plaintiffs' ICFA claim fails because the alleged "representation" on which Plaintiffs rely is nothing more than an opinion or representation of future events. Plaintiffs respond that the ICFA should be applied to the greatest extent possible to eliminate all forms of deceptive practices. As discussed above, Plaintiffs do have claims that TBI was deceptive in the present and/or past. Therefore, this argument fails.

### 2. "Deceptive" under the Consumer Fraud Act

Next, TBI argues that, even if TBI's alleged representation is actionable under ICFA, it was not deceptive. "[A] statement is deceptive [under the ICFA] if it creates a likelihood of deception or has the capacity to deceive." *Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). If, however, the information disclosed or otherwise available to a consumer dispels any statements that might tend to deceive, there is no

deception. *Id.* at 938-39. TBI argues that the disclosures in the TILDS, GFE, and Acknowledgment to the Application made clear that TBI was not making a commitment to lend and was merely estimating the potential costs of the loan Plaintiffs were seeking.

In response, the Witts argue that the deceptive practice requirement of the ICFA is satisfied when the material misrepresentation element of common law fraud is met, meaning if a triable issue regarding intent to deceive under common law fraud is raised, then a triable issue regarding deception is raised. (Resp. at 16-17.) Since the Court has found above that there is a triable issue as to the alleged misrepresentation for fraud, the same is found for deception. *See Miller*, 326 Ill. App.3d at 655-56.

Defendant's motion for summary judgment as to Count II is denied.

## C. Count III - Promissory Estoppel

To recover under their promissory estoppel count, Plaintiffs must be able to prove that: (1) TBI made an unambiguous promise; (2) Plaintiffs relied on that promise; (3) Plaintiffs' reliance was expected and foreseeable by TBI; and (4) Plaintiffs relied on the promise to their detriment. *See Newton Tractor Sales, Inc. v. Kubota Tractor Corp.*, 233 Ill. 2d 46, 51 (2009). Plaintiffs' reliance on the alleged promise "must be reasonable and

21

justifiable." *Hozzian v. City of Chicago*, 585 F. Supp. 2d 1034, 1040 (N.D. Ill. 2008).

Defendant argues that Plaintiffs have not and cannot prove the "unambiguous promise" element of promissory estoppel, and even if they could, Plaintiffs could not have justifiably relied on it. (Mot. at p. 18.) In response, the Witts allege that TBI, through Mr. Cristol, advised Plaintiffs that they did qualify and were approved for a 30 year fixed mortgage and that TBI's communications and actions through November 14, 2007 bolstered this belief. (Resp. at p. 18). As discussed above, there is an issue of material fact for trial as to the time line and what was communicated to the Witts. Therefore, Defendant's argument that Plaintiffs cannot prove an unambiguous promise fails at the summary judgment stage. As for TBI's argument regarding reliance, the test of justifiable reliance is the same as for fraud and promissory estoppel. *Glass v. Kemper Corp.*, 949 F.Supp. 1341, 1347-48 (N.D. Ill. 1997) (*citing Mason & Dixon Lines, Inc. v. Glover*, 975 F.2d 1298, 1305 (7th Cir. 1992). Therefore, for the reasons stated above, Defendant's argument fails. Defendant's motion for summary judgment as to Count III is denied.

### D. Damages

Finally, Defendant argues that it is entitled to judgment as a matter of law on the fraud, Consumer Fraud, and promissory

estoppel actions, because Plaintiffs cannot prove that TBI's alleged representation or omission caused their alleged damages. These damages, as Defendant outlines, are: (1) $247,211 in monies paid to the Builder that were not returned when Plaintiffs were declared in default; (2) the profits Plaintiffs lost in not selling their current home because they had no home to move to; and (3) $18,509.44 in commission advances that Mrs. Witt received through her employment at Baird & Warner real estate that Plaintiffs returned.

Defendant specifically alleges that the proximate cause analysis and the "but for" test apply to Plaintiffs' three alleged counts, and that because Plaintiffs cannot prove that their alleged damages and losses would not have occurred "but for" TBI's alleged representation or omission, TBI is entitled to summary judgment. (Mot. at pp. 19-20.) In response, Plaintiffs argue that the proximate cause analysis is not required for all three counts, but go on to argue that the facts, when viewed in favor of the non-moving party, create a genuine issue of material fact under the "but for" application and thus, summary judgment should be denied here. (Resp. at pp. 19-21.)

First, Defendant argues that Plaintiffs would have defaulted, the Builder would have retained Plaintiffs' $247,211, and Mrs. Witt would have been required to return the $18,509.44 commission even if TBI had issued the loan set forth in the

Application. Defendant reasons that, even if TBI had funded a mortgage loan in the allegedly promised amount of $1,280,000, Plaintiffs still could not have afforded to purchase the Home because they did not have sufficient resources to cover the purchase price. (Mot. at p. 20.) Defendant explains that "the undisputed facts show that Plaintiffs would need a loan amount of at least $1,600,000 to close. That amount is $320,000 more than the $1,280,000 TBI allegedly represented it could and would issue at closing." (*Id.* (internal cites omitted.)) Thus, Defendant argues, even if TBI had issued the loan described in the Application, Plaintiffs would not have been able to close on the purchase of the Home.

Plaintiffs respond that, "In failing to notify Plaintiffs, TBI did not allow Plaintiffs to seek alternate financing opportunities from the months of May to November. This notably includes the months pre-August 2007, the crash of the mortgage market. As such, Defendant's omissions proximately caused Plaintiffs' default because but for the Defendant's omissions, the Plaintiffs could have sought alternate financing in a healthy loan market for several months to cure the lack of a TBI mortgage." (Resp. at p. 20.) Therefore, Plaintiffs argue that the actions or omissions of TBI did proximately cause Plaintiffs' default with the Builder and subsequent return of Mrs. Witt's sales commission. The Court finds that there is a genuine issue

of material fact as to the proximate cause of the monies not returned by the Builder and the return of Mrs. Witts' advanced sales commission. Therefore, Defendant's argument as to these damages fails.

Next, Defendant argues that "TBI's alleged representation and omission were wholly inconsequential to the profit Plaintiffs might have realized from selling their current house in December 2007." (Mot. at p. 21.) TBI applies the same rationale as above, and alleges that the loan amount set forth in the Application would not have been sufficient to allow Plaintiffs to close on the purchase of the Home, and with this knowledge, Plaintiffs made the choice to reject the offer and forego the profit from the sale of their current home. (*Id.* at p. 22.)

In response, Plaintiffs acknowledge that they were the ultimate decision-makers in deciding not to sell their current house in 2007, but argue that Defendant ignores the limitations that TBI's conduct placed upon the Plaintiffs' choices. (Resp. at p. 21.) Plaintiffs state that "But for Defendant's misrepresentations, Plaintiffs would have had a place to move to and hence would have sold their current home. In all, but for the misrepresentations of the Defendant, TBI Mortgage, the Plaintiffs would have had more time, including pre-financial crisis time, to find a mortgage that would enable them to purchase their dream Home." (*Id.*) Again, accepting the Witts

facts as true, the Court finds a genuine issue for trial here. Defendant's request for summary judgment on Counts I-III is denied.

Finally, Defendant requests that the Court limit the amount of Plaintiff's damages. Defendant argues that the alleged damages for the amount retained by the Builder are no more than $89,728. (Mot. at pp. 22-23.) Having already determined that there is a genuine issue for trial as to damages, the Court will not address the amounts alleged. The Court leaves the determination of damages to the trier of fact. Therefore, Defendant's request that the Court limit Plaintiffs' damages is denied.

## IV. Conclusion

For the reasons set forth above, Defendant's motion for summary judgment [66] is denied.

Date: February 15, 2012      E N T E R E D:

MAGISTRATE JUDGE ARLANDER KEYS
UNITED STATES DISTRICT COURT